UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 09-20964-CR-PAS

UNITED STATES OF AMERICA                    MIAMI, FLORIDA

                                            June 16, 2010
        Versus                              VOLUME I

                                            PAGE 1 TO 57
DAWIS GONZALEZ
RAMON CANTILLO-MARTINEZ
                    Defendants


                    SENTENCING HEARING
            BEFORE THE HON. PATRICIA A. SEITZ, J.
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
                        SEAN T. MC LAUGHLIN, ESQ.
                        Assistant United States Attorney
                        99 N.E. 4th Street
                        Miami, FL  33132


FOR THE DEFENDANTS CANTILLO-MARTINEZ AND GONZALEZ:

                        MARIA ELENA PEREZ, ESQ.
                        145 Madeira Avenue - Suite 310
                        Coral Gables, FL  33134




REPORTED BY:            DAVID S. EHRLICH, RPR
                        Official Court Reporter
                        Wilkie D. Ferguson, Jr.
                        U. S. Courthouse
                        400 N. Miami, Room 11-4
                        Miami, Florida 33128-1810
                        (305) 523-5537

1          (Court convened at 8:47 a.m.)

2          MS. WEBB:  Case number 09-20964 criminal, United States

3 versus Ramon Cantillo-Martinez and Dawis Gonzalez.

4          Counsel, please state your appearances.

5          MR. MC LAUGHLIN:  Good morning, Your Honor.  Sean

6 McLaughlin on behalf of the United States.

7          THE COURT:  Okay, Mr. McLaughlin.

8          MS. PEREZ:  May it please the Court, Your Honor, Maria

9 Elena Perez on behalf of Ramon Cantillo and Dawis Gonzalez, both of

10 whom are present before the Court with the aid of an interpreter.

11         THE COURT:  And Mr. Cantillo-Martinez is next to you and

12 Mr. Gonzalez is far away?

13         MS. PEREZ:  No.  It's the other way around, Judge.

14         THE COURT:  And on behalf of Probation?

15         Please have a seat everyone.

16         PROBATION OFFICER:  Lakeisha Brantley on behalf of U. S.

17 Probation.  Good morning, Your Honor.

18         THE COURT:  I apologize for keeping you all waiting.  If it

19 could go wrong today it went wrong.  But thank you for calling, Mr.

20 McLaughlin, so that we knew that you were okay.

21         MR. MC LAUGHLIN:  I barely made it here, but I did make it.

22         THE COURT:  And I am grateful to the Marshals also letting

23 us know that they were running behind time today.  Thank you.

24         We are here this morning to impose sentence on Mr. Gonzalez

25 and Mr. Cantillo-Martinez.

1       First let me ask, can both of you hear the translator

2  satisfactorily?

3       MR. GONZALEZ:  Yes.

4       MR. CANTILLO-MARTINEZ:  Yes.

5       THE COURT:  Mr. Gonzalez, have you had an opportunity to

6  meet with Mrs. Perez to review the Presentence Investigation Report?

7       MR. GONZALEZ:  Yes.

8       THE COURT:  Did she arrange to have it translated into

9  Spanish for you?

10      MR. GONZALEZ:  Yes.

11      THE COURT:  The same questions to you,

12 Mr. Cantillo-Martinez.  Have you had a chance to meet with

13 Miss Perez to go over the Presentence Investigation Report?

14      MR. CANTILLO-MARTINEZ:  Yes.

15      THE COURT:  And did she arrange to have it translated into

16 Spanish for you?

17      MR. CANTILLO-MARTINEZ:  Yes.

18      THE COURT:  This is a question to both gentlemen.  As you

19 reviewed the Presentence Investigation Report after Miss Perez had

20 it translated into Spanish, did you note any fact in the Presentence

21 Investigation Report, either in the description of the offense, in

22 your personal history, in your criminal history, that was incorrect;

23 anything from a typographical error to something more substantive?

24      MR. GONZALEZ:  Yes.

25      THE COURT:  Then tell me what were the facts that are

1  incorrect, Mr. Gonzalez.

2          MS. PEREZ:  Judge, I think what he was trying to say is the

3  objections that he has are the ones I manifested in writing to the

4  Court and I filed with the Court.

5          THE COURT:  Miss Perez, please listen to the question.  My

6  question was was there any facts, f-a-c-t-s, facts that are

7  incorrect.  I will deal with the objections as soon as I find out

8  whether or not in the description of the offense conduct starting on

9  page 5, through the acceptance of responsibility as it is set out

10 there, then skipping over the computations, those are not facts,

11 those are the computations to which the objections are directed, the

12 descriptions of the criminal convictions, and the other criminal

13 conduct, the offender characteristics under the personal family

14 data, the physical condition, the mental and emotional condition,

15 the substance abuse history, the education vocational skills, the

16 employment record, the financial condition, and ability to pay,

17 that's what I'm looking at.

18          MS. PEREZ:  Yes, Judge, those are correct.

19          THE COURT:  Do you agree with that, Mr. Gonzalez?

20          MR. GONZALEZ:  Yes.

21          THE COURT:  And Mr. Cantillo-Martinez, do you agree --

22          MR. CANTILLO-MARTINEZ:  Yes.

23          THE COURT:  -- there are no factual errors in your report?

24          MR. GONZALEZ:  No.

25          MR. CANTILLO-MARTINEZ:  No.

1          THE COURT:  Okay.  Then let us turn --

2          Does the government have any factual corrections?

3          MR. MC LAUGHLIN:  No, Your Honor.

4          THE COURT:  As I was speaking with Miss Brantley this

5   morning, she did advise that in -- I think it was Mr. Gonzalez's

6   description of his criminal history, on page 13 paragraph 35 she has

7   copied that directly from the state records and where they referred

8   to Mr. Avila as Mr. Jesus Barrera-Barrera because that was the alias

9   that he had used and which he was charged as a codefendant with

10  Mr. Gonzalez in the armed robbery and kidnapping case in 1997.  So

11  if anyone had a question about that we can put that question to

12  rest.

13         Let us turn to the objections.  I have read the parties'

14  papers, so I don't need to have lengthy argument on it.  But maybe

15  to succinctly summarize what I understand are the parties' position,

16  as to Mr. Gonzalez, Miss Perez is objecting to a number of things:

17  The failure to provide the minor role on the grounds that he was

18  just there and had no other involvement, which I don't think is

19  supported by the facts; and the defendant does have the burden to

20  prove the minor role is appropriate.

21         The government's response is, A, that position is not

22  supported by the facts under De Varon, and because Mr. Gonzalez is a

23  career offender because of his three prior felonies he is not

24  eligible for the minor role.

25         The second objection is that he should not be classified as

a career offender because it over represents his criminal history.
I think that's the shorthand position.

The government's response to that is that there are three
prior felony convictions for armed robbery and kidnapping, and those
three prior convictions for violent crimes, even though he has
attempted to change, this is a repeat of that type of crime.

The defendant's argument is that he was young back then, he
is now in his early 30s.

The government's response is he is still continuing it at
definitely an adult age and so that there is evidence of recidivism
that he just can't stay away.

The government also suggests, although I have not seen the
evidence of this, is that Mr. Avila-Barrera --

Is it Barrera-Avila or Avila-Barrera?

MR. MC LAUGHLIN:  Barrera-Avila, Your Honor.

THE COURT:  -- Barrera-Avila called Mr. Gonzalez and
Mr. Cantillo-Martinez because they have known each other for a long
time having been codefendants, and that Mr. Barrera-Avila had been
working with Mr. Gonzalez in another drug deal or drug robberies,
and Mr. Gonzalez has been able to fence or sell the drugs that were
obtained in those other robberies, and that
Mr. Cantillo-Martinez functioned as Mr. Gonzalez's driver because
Mr. Gonzalez did not have a license, nor did Mr. Barrera-Avila have
a license.  So Mr. Cantillo-Martinez functioned as the chauffeur for
everyone getting them hither, thither and yon, driving them to try

1 and find the weapon and things like that.

2          MR. MC LAUGHLIN:  Your Honor, if I may.  Those were facts

3 elicited at trial during codefendant Grajales's trial.  There was

4 testimony elicited from both Mr. Cantillo and Mr. Barrera-Avila.

5          And just to clarify a touch, Mr. Barrera-Avila knew

6 defendant Gonzalez from long ago.  They had done prior robberies

7 together.  But also Mr. Barrera-Avila had engaged in cocaine

8 trafficking with Mr. Gonzalez up and in and around Panama City.  So

9 part of the reason that Mr. Barrera-Avila reached out to

10 Mr. Gonzalez is because in Mr. Barrera-Avila's mind that would be a

11 way to get rid of the cocaine and sell it through Mr. Gonzalez.  And

12 that was elicited at trial, Your Honor.

13          THE COURT:  So that is sort of the summary.  What I'm

14 trying to do is share with you is my take on the parties' papers and

15 then you all can succinctly address whether or not I don't

16 understand the facts or I incorrectly understand the law.

17          My understanding is that the next objection, and this

18 applies to both Mr. Gonzalez and Mr. Cantillo-Martinez, is that

19 there is a basis for a downward departure because of -- applying

20 Eighth Circuit law there is evidence -- according to Miss Perez no

21 question -- that law enforcement manipulated the amount involved to

22 drive up the sentence.

23          The government has responded that there is no evidence of

24 such and in fact as the evidence came out at trial that number was

25 picked to try and make it be realistic and to prevent anyone from

just trying to think that it is an opportunistic moment with no
exposure if it were a small amount thinking that there would be no
real serious consequences.  The amount was involved so that people,
particularly those that are experienced in the criminal justice
system who don't want to be involved would recognize the potential
consequences on the down side and would not be involved unless they
wanted to be involved.

Last but not least the argument is preserving the argument
as to whether or not the five-year consecutive sentence should be
applied for Count 5.  And I can take care of that one, Miss Perez.

MS. PEREZ:  Yes, Your Honor.

THE COURT:  As to both defendants you note that given the
Eleventh Circuit's case law, which I'm required to follow --

MS. PEREZ:  Yes, Judge.  The Segarra case?

THE COURT:  The Segarra case.  So I will overrule that
objection.  But you have made it and you've preserved it especially
since it is pending before the Supreme Court, and the Supreme Court
just yesterday reversed the Eleventh Circuit on the Holland case,
with which I'm very familiar, and so who knows, the Eleventh Circuit
may be reversed again, and then we would address that.  And if it is
reversed, then I would simply subsume that into the guidelines.

And Mr. Cantillo-Martinez also has a minor role argument.
And his argument is based on the fact that he was only there to
drive the car.

I will share with you, as to the minor role I sentenced

1 Mr. Puebla yesterday. To me it was a much closer question as to

2 whether or not Mr. Puebla was eligible for a minor role because he

3 sort of got involved the day of the incident when everyone met him

4 at the car wash and talked him into joining. And I denied the minor

5 role for Mr. Puebla because he was there, he was ready, he went and

6 got the weapon, it wasn't just simply a minor role.

7 These two gentlemen were involved much earlier. But for

8 Mr. Martinez driving the car they wouldn't have gotten there since

9 nobody else had a driver's license, and I'm glad that they were very

10 respectful of the law in that sense that none of them were driving

11 since they didn't have driver's licenses. But

12 if Mr. Cantillo-Martinez had said, "No, I'm not driving," no one

13 would have gotten there.

14 MS. PEREZ: Judge --

15 THE COURT: And he had been involved prior to, and I just

16 don't see that the minor role is appropriate.

17 So those are my thoughts. And I'm happy to give you the

18 opportunity to address each one succinctly and tell me what facts I

19 misperceive or the law that I misunderstand.

20 MS. PEREZ: Judge, let me start with what I feel is

21 probably the easiest one for me, and that's Mr. Cantillo's minor

22 role. Judge, I don't think that Mr. Cantillo not driving would have

23 prevented this robbery from happening. I don't think that

24 individuals such as Mr. Avila that are seasoned criminals and that

25 never stopped, because at least Mr. Gonzalez fell out of the picture

1  for seven years and --

2       THE COURT:  That is inconsistent with what the testimony

3  was at trial.

4       MS. PEREZ:  Judge, for seven years Mr. Gonzalez was not

5  doing home invasions with Mr. Avila.

6       THE COURT:  But he was doing drug dealing.

7       MS. PEREZ:  Mr. Gonzalez did brief drug dealing at a very

8  low level, a very small scale, and had already ceased doing it.

9       THE COURT:  Well, that makes him okay?

10      MS. PEREZ:  No, Judge, it does not make it okay.  But he

11 was not doing that with Mr. Avila.  I don't know why Mr. Avila is

12 saying that he was doing drug dealing with Mr. Gonzalez.  The one

13 that told the government he was doing drug dealing in Panama City

14 was Mr. Gonzalez, who debriefed with the government and who has been

15 very forthcoming, Your Honor.  I'm not trying to minimize

16 Mr. Gonzalez's conduct.  This is true.  We are not denying that.  We

17 are the ones that came forward and said that.  But at no time did

18 Mr. Gonzalez put Mr. Avila to push drugs for him, and Mr. Gonzalez

19 did not profit from Mr. Avila dealing drugs.  That is incorrect.

20 I'm not trying to minimize.  I'm just trying to correct the facts.

21 So that is not correct, Your Honor.

22      THE COURT:  Then I would like to hear from

23 Mr. McLaughlin, because unfortunately some of your papers when they

24 make some statements it either overstates some of the facts or

25 ignores some of the facts.  So I may not have confidence as to your

1  rendition of the accurate facts.

2      MS. PEREZ:  Judge, I understand.  That's fine.

3      THE COURT:  Mr. McLaughlin, what are the specific facts?

4      MR. MC LAUGHLIN:  As to Mr. Gonzalez's narcotics activity

5  in and around Panama City?

6      THE COURT:  Yes.

7      MR. MC LAUGHLIN:  That was actually brought to our

8  attention by Mr. Barrera-Avila.  And in a subsequent debriefing

9  Mr. Gonzalez had no choice but to admit it.  I don't think there is

10  much more to it than that.

11      THE COURT:  What is the nature and the scope of it?

12      MR. MC LAUGHLIN:  Mr. Barrera-Avila had --

13      THE COURT:  What I need are the specifics.

14      MR. MC LAUGHLIN:  He participated in selling cocaine up in

15  and around Panama City for Mr. Gonzalez, he also had transported I

16  believe it was a half kilo for Mr. Gonzalez from Panama City down

17  here to Miami.

18      THE COURT:  On two occasions we are talking about and their

19  kilos are half-kilo amounts?

20      MR. MC LAUGHLIN:  Correct.  And I would concede that

21  Mr. Gonzalez has been helpful in providing certain information to

22  law enforcement about contacts he has in and around Panama City, and

23  that has led to an investigation up there.  But I think it is fairly

24  obvious that he was engaged in cocaine trafficking up in and around

25  Panama City and even down here.  So --

1          THE COURT:  Okay.

2          MS. PEREZ:  Judge, I was not present when Mr. Avila

3    debriefed.  I don't know what he said.

4          THE COURT:  Do you disagree with Mr. McLaughlin's summary

5    as to what he was doing with Mr. Avila?

6          MS. PEREZ:  Yes, Judge, I disagree.  I never heard about a

7    half-kilo transaction.  I never heard about that.  That was not

8    discussed at Mr. Dawis's debriefing.  I was there.

9          I know that there was one issue involving 27 grams of

10   cocaine that Mr. Avila took that he did not pay for, that he

11   profited alone independently of Mr. Gonzalez, and that's what I

12   understand.

13         Excuse me, Judge.

14         THE COURT:  Mr. McLaughlin, were you at the debriefing with

15   Mr. Gonzalez?

16         MR. MC LAUGHLIN:  Yes.

17         THE COURT:  Is she accurate that this was not discussed

18   with Mr. Gonzalez?

19         MR. MC LAUGHLIN:  We just touched on it very briefly, Your

20   Honor.  My main concern was getting a sense of what he was going to

21   say about Mr. Grajales.

22         I can tell the Court that I have no reason to disbelieve

23   Mr. Barrera on this issue.  And in light of Mr. Gonzalez's

24   cooperation with law enforcement up in and around Panama City, I

25   don't -- my opinion:  I have a hard time believing Mr. Gonzalez

1  disagrees with that.

2         The fact remains, Your Honor, that Mr. Gonzalez has a

3  lengthy violent criminal history, he has continued to engage in

4  criminal activity, including narcotics trafficking.  One of the main

5  reasons he was recruited to participate by Mr. Barrera-Avila was his

6  ability to sell cocaine.  There is no reason for a downward

7  departure here.  That's our position.

8         THE COURT:  Okay.

9         MS. PEREZ:  Judge, I do not take issue with the fact that

10 Mr. Gonzalez was involved briefly in cocaine trafficking.  We are

11 not disputing that.  We are not disputing that.  But we are

12 disputing the fact that Mr. Gonzalez was targeted because he could

13 move the cocaine.

14        First of all, Judge, Mr. Avila was selling drugs --

15        THE COURT:  What facts do you have?  What testimony do you

16 have that that would refute?  Is he going to take the stand right

17 now and tell me that he did not have prior experience with

18 Mr. Barrera-Avila and that he had not sold drugs for

19 Mr. Barrera-Avila in the past or sold drugs that could be a seller

20 of this amount of cocaine?

21        MS. PEREZ:  Judge, he has sold drugs.  Mr. Barrera-Avila

22 has sold drugs for himself, not for Mr. Gonzalez.  Mr. Gonzalez

23 takes contention with the fact that it is being represented that Mr.

24 Avila is selling drugs for Mr. Gonzalez.  That is not correct.

25        THE COURT:  Okay.  But Mr. Gonzalez lives up in Panama

1  City.

2          MS. PEREZ:  That's correct.

3          THE COURT:  This sting, which is in a different time zone

4  than our time zone, it is that far away, and this occurs down here

5  in Miami.  So just out of the goodness and kindness of his heart

6  Mr. Barrera is going to call Mr. Gonzalez, his old friend from their

7  criminal days as young men, and say, "Come down to Miami and help me

8  with this drug deal," and he calls him in late October and they come

9  down, he has his driver drive him down --

10          How many hours is that?  12 hours, ten-hour drive down to

11  Miami just to be involved in this because they just happened to be

12  in the neighborhood?

13          MS. PEREZ:  No, Judge.  The reason that they were in the

14  neighbor, as Your Honor will hear from the witnesses that are in the

15  courtroom, was because Mr. Cantillo and Mr. Gonzalez were in the

16  process of recording a song.  Music.  They were down here in a

17  recording studio.  That's why they came to Miami.

18          THE COURT:  And so they just ran into Mr. Barrera-Avila on

19  what day?

20          MS. PEREZ:  No, Judge.  I would be more than happy to lay

21  out the facts exactly how it occurred.

22          My clients became involved in this case days before the

23  event occurred.  Yes, Mr. Avila reached out to Mr. Gonzalez because

24  they are friends, they have been friends for many years.  Mr.

25  Cantillo --

1          THE COURT:  And coconspirators in drug dealing.

2          MS. PEREZ:  They have been friends for many years, Judge.

3 They have committed robberies in the past, this is true.

4          Mr. Gonzalez --

5          THE COURT:  And they have been involved in drug

6 transactions or drug trafficking.

7          MS. PEREZ:  That is correct, Judge.  But Mr. Gonzalez

8 agreed to participate just to participate, not because he was going

9 to be able to actually move the drugs.  Everybody was going to take

10 their own take.  The government knows that.

11          I haven't heard at any time that Mr. Gonzalez was targeted

12 because Mr. Gonzalez was going to sell everyone's drugs.  I have not

13 heard that.

14          THE COURT:  So let's take that aside.  But does that

15 justify --

16          If we ignore that, you admit that he got involved back in

17 October when he was called, and he came down and participated in

18 this and, oh, by the way, he is also multitasking.  He is also

19 recording, or supposedly recording, at the same time.

20          MS. PEREZ:  That is correct, Judge.

21          THE COURT:  That doesn't make him a minor role.

22          MS. PEREZ:  I'm not saying that he -- Judge, this is what

23 I'm trying to put in place.  If we compare his conduct to the

24 remainder of the defendants, neither Mr. Cantillo or Mr. Gonzalez

25 brokered this transaction, they were not the architects of this,

1 they did not attend any of the numerous meetings that were

2 videotaped and audiotaped over and over again.

3         THE COURT:  But they participated in meetings with

4 Mr. Grajales, they participated in meetings to find the weapon and

5 they went out to try and find the weapon.

6         MS. PEREZ:  Judge, on November 4, on November 4, on the day

7 of the offense, they all did meet at Mr. Grajales's home.  That was

8 the only meeting Mr. Dawis had and Mr. Cantillo had with

9 Mr. Grajales.  Mr. Puebla is the individual that went out and found

10 the gun; not Mr. Gonzalez and not Mr. Cantillo.

11         I don't understand why Mr. Gonzalez -- they are imputing

12 the conduct of finding the weapon to him.  That is not correct

13 either, Judge.

14         THE COURT:  So you are saying these two guys are like

15 angels --

16         MS. PEREZ:  No.

17         THE COURT:  -- they come down here and they just are so

18 stupid they just happened to be in the car and they're going along

19 to provide moral support and, therefore, that justifies a minor

20 role?

21         MS. PEREZ:  No, Judge, they are not angels.  But yes, they

22 are stupid.

23         And one of the problems that Mr. Gonzalez has throughout

24 his life, and this has a lot do with Mr. Avila, is Mr. Gonzalez,

25 unfortunately, Judge, is very immature, and he has a history with

1  Mr. Avila.  They have been friends for many years, Judge.  When

2  these individuals were both in state custody and they were

3  codefendants, the Judge in one of the cases was very upset and told

4  Mr. Gonzalez that if he did not plead guilty Mr. Avila was going to

5  basically get 20 years.  Mr. Gonzalez pled guilty because he

6  participated and he took his time.  They are very close, Judge.

7  They have a relationship.

8         Mr. Avila always seeks out Mr. Gonzalez.  Unfortunately,

9  Mr. Gonzalez at this time he gave in.  He agreed to participate.  It

10  was stupid.  It was stupid.

11         THE COURT:  But he is 31 years old.  He has a longstanding

12  relationship, no one put a gun to his head.

13         MS. PEREZ:  No.

14         THE COURT:  He has been in jail before, he knew that he

15  would go back to jail if he was caught, he made a decision to be

16  involved.  There are consequences to his decision, and he has to

17  live with those decisions.

18         MS. PEREZ:  I understand that, Judge.  But --

19         THE COURT:  So I don't hear anything that would justify the

20  minor role as to Mr. Gonzalez.

21         MS. PEREZ:  Judge, and I respect that.  And again that

22  issue has been preserved.

23         With respect to Mr. Cantillo, Judge, like I indicated to

24  the Court, I highly doubt that this plan would not have moved

25  forward if Mr. Cantillo would have refused to drive.

1          Mr. Cantillo has only known these individuals for one year.

2     Mr. Cantillo met Mr. Gonzalez at the recording studio.

3     Mr. Cantillo is 27 years old.  He has been in the United States for

4     barely three years; a little over three years, Judge.  That's how he

5     met Mr. Gonzalez.  He did not meet Mr. Gonzalez in a cocaine deal.

6     And I don't think that the government has any evidence of that.

7          So, Judge, I think that Mr. Cantillo at a minimum would

8     qualify for a minor role.  Because he was used for his license?  He

9     was used as a driver?

10          THE COURT:  He is 27 years old.  No one is holding a gun to

11     his head.  He can say, "I'm not driving."

12          MS. PEREZ:  I understand, Judge.  But I think that a

13     driver, a lookout, are typically individuals that qualify for a

14     minor role.

15          THE COURT:  But he was going to get five kilograms of

16     cocaine out of this deal.  That's not a minor role.

17          MS. PEREZ:  Judge, I respect Your Honor's --

18          THE COURT:  Okay.  He was going to get the cocaine and he

19     was going to turn around and sell it so that -- or have Mr. Gonzalez

20     sell it so that he would get the cash.

21          MS. PEREZ:  Judge, Mr. Cantillo didn't do -- was not the

22     architect of this, he didn't attend any meetings --

23          THE COURT:  Miss Perez, if I gave a minor role for this,

24     then it would be a license to anyone out there on the street that

25     you get a minor role for five kilograms of cocaine; it's okay, it's

1 permitted, it's just we'll give you a slap on the wrist. That's

2 basically what your argument is.

3 MS. PEREZ: Judge, that's not my argument. That is not my

4 argument. But I --

5 THE COURT: That's the consequences of your argument.

6 MS. PEREZ: Judge, I have a difficult time saying that five

7 kilos of cocaine would disqualify him for a minor role when I have

8 gotten the government to give me a minor role on a 9,000 kilo

9 cocaine transaction in front of Judge Jordan. That's my problem.

10 It's disparity. Five kilos for a driver?

11 THE COURT: What were the facts in the Judge Jordan case?

12 Are you saving that he was a driver and that was it?

13 MS. PEREZ: Juan Diego Espinosa. He worked counting kilos.

14 9,000 kilos. A lot of kilos.

15 THE COURT: And all his job was to count?

16 MS. PEREZ: To count kilos, Judge, and he also helped --

17 THE COURT: And what were the other individuals? We are

18 talking apples and oranges just based on the facts that you told me.

19 MS. PEREZ: Well, Judge, I'm only relaying these facts

20 because Your Honor indicated that the five kilos for some reason

21 would somehow pull him out of the minor role. I don't think that is

22 fair.

23 THE COURT: Please look at all of the facts that I said

24 rather than just picking and choosing the one you want.

25 Someone who is participating in a robbery that they are

1 going to have a weapon, he knows he is going to do it, he is going

2 to be the one that drives them there, he's the one that drives them

3 to the car wash that they find Mr. Puebla who then, according to you

4 is the one that is going to help them find the weapon, he is doing

5 this because he wants to get five kilograms.  Five kilograms doesn't

6 -- you can't take that to Publix to get bread.  You have to sell the

7 kilograms.  You have to traffic in drugs so that you can get the

8 cash.

9          And if he, 27 years old, knows all of these facts, goes

10 along with it, that does not justify a minor role.  For me to find a

11 minor role in this particular conspiracy on those facts I would have

12 to say basically that if you're getting five kilograms out of an

13 armed robbery, that merits a minor role?  That almost is a statement

14 to the community that if it's five kilograms or less that's okay in

15 our community.  That sort of sounds like we would be supporting a

16 narco community.

17          MS. PEREZ:  Judge, I understand that that could be a

18 message that could be read to.  But I don't think that that is

19 exactly what it would mean.

20          And just for clarity sake, Mr. Cantillo was not going to

21 have a gun, Judge.  There was one gun that was recovered amongst

22 five people.  This was a very poorly hatched plan, Judge.

23          And again, Judge, Mr. Cantillo I believe is on the very,

24 very outer fringes of this if you compare his conduct to that of

25 everyone else.  That is why I believe that he is entitled to a minor

1  role, Judge.  That is why I believe that Mr. Gonzalez is entitled to

2  a minor role because they didn't participate to the greater degree

3  as everyone else did.  They didn't recruit anyone, they didn't

4  broker the deal, they didn't think about this, they weren't the

5  architects of this, it wasn't their car, they did not specifically

6  come down here for that.  They were here for other reasons.  They

7  got sucked into this, Judge.  We are not denying that.

8         And Mr. Gonzalez regrets it deeply.  So does

9  Mr. Cantillo.  I think that this is quite literally the stupidest

10  thing that either one of them has ever done in their life.

11         THE COURT:  And I agree with you.  I wish that we could

12  turn the clock back and erase their decision.  But, unfortunately,

13  it is the past, and I'm going to deny the minor role for both

14  gentlemen.

15         I am not giving them an enhancement.  Mr. Grajales is the

16  one that will get the enhancement, although he, I'm sure, will argue

17  that he was simply just a broker here.  But he was the one that was

18  the architect.

19         MS. PEREZ:  Judge --

20         THE COURT:  These gentlemen participated.  So they are the

21  same as everyone else.

22         MS. PEREZ:  Judge, the only remaining argument that I have

23  is a sentencing manipulation apart and aside from 3553 factors for

24  the Court to consider.

25         THE COURT:  You're not going to make the down adjustment

1  for career offender?

2      MS. PEREZ:  Yes, Judge.  I will leave that for last, Judge.

3      With respect to sentencing manipulation, Judge, I

4  understand that the jury found that there was not entrapment.  And

5  the case law says that even if there is a finding of no entrapment

6  sentencing manipulation can still exist notwithstanding that fact,

7  Judge.

8      Judge, we're not saying that the government was outrageous.

9  We're not saying that, Judge.  But the government was in control of

10  the quantity of drugs.  They were the ones that made this

11  proposition.  It started out as 28, it ended up as 30.

12      I understand the government's position is that for this to

13  be a real crime it needed to be 30 kilos.

14      THE COURT:  They started out at 28.  It was only at the

15  last moment that it became two kilos more, 30.  So we're dealing

16  with 28.

17      MS. PEREZ:  Correct, Judge.  And, Judge, I think that the

18  drug time is what really -- not for Mr. Gonzalez because he has

19  career offender, but particularly for Mr. Cantillo, the drug time is

20  really the larger sentence here.  It's the greater sentence.  It is

21  a ten-year minimum mandatory.

22      Now, Judge, I think that in this case the government could

23  have very well said, "Let's do it for ten kilos."  I mean, if

24  they're going to rob -- I don't know if Your Honor read the police

25  reports in the state cases involving Mr. Avila, but one of them

 1  involved cigarettes.  So, I mean, if you're going to rob cigarettes,

 2  you're going to rob five kilos, you're going to rob ten kilos, I

 3  think that they could have tested the waters with the lower drug

 4  amount.  And I think that being that they were the only ones in

 5  control of that, that they set it so high, I think that was not the

 6  fairest thing and I think that that would be a basis for a downward

 7  departure.

 8        I don't need to go over the Eighth Circuit case law and the

 9  Ninth Circuit case law that I cited, Judge.  I know that Your Honor

10  read it, and I would rely on my pleadings with respect to the legal

11  argument as it concerned sentencing manipulation, Judge.  But that

12  is what our position is.

13        THE COURT:  I find no facts to support a suggestion that

14  there was an intentional manipulation, and I believe that the

15  defendants have conceded that there is no extraordinary outrageous

16  conduct by the government here.  There is simply counsel's

17  disagreement that it should have been for less.  The difference,

18  Miss Perez, would be -- you sort of concede that they should have

19  done it for ten to 12 kilogram.  The difference would be simply two

20  levels.

21        The bottom line is that the large amount was known to the

22  parties.  They could have rejected that.  They elected to do that.

23  It was designed to make sure that only those who really wanted to be

24  involved understood that there would need to be weapons involved

25  would be the ones that would get involved.  People that are afraid

1  of weapons are not experienced enough in doing large ones usually

2  would have second thoughts.  I will overrule the objection on that

3  basis.

4          The next one.

5          MS. PEREZ:  Judge, with respect to the criminal history of

6  Mr. Gonzalez, Judge, in his offense of '97 Mr. Gonzalez was 17 years

7  old.  He was a minor.  Judge, I think that these cases occurred, one

8  on February 6, '97 was the first offense; the next one in the PSR

9  report is March 6 of '97, and March 5 of '97.  Then we have a later

10 offense which was when he was released for driving with a license

11 suspended, Judge.  And then we have seven years, Judge, of no

12 criminal history, and then we have this case.

13         THE COURT:  No criminal convictions .

14         MS. PEREZ:  No criminal convictions, Judge.  That's

15 correct.

16         Now, Judge, obviously I think that because these offenses

17 are so close in time and because there was no intervening arrest I

18 argue, Judge, that at least it should be counted as two instead of

19 three.  That is stated in my objections.

20         And, Judge, I really think it does over represent him.  I

21 think it shoots him all the way up into career criminal.  I think

22 there are individuals that have far more felonies that are placed

23 into this category.

24         THE COURT:  The incident that is reflected in paragraph 34

25 occurred on March 5 of 1997.  The incident that is reflected in

paragraph 35 occurred on February 28, 1997. So there were two

separate incidents. He was in custody as to the March 5 incident

when he was charged with the February 28 incident.

MS. PEREZ: On March 6. That's correct, Judge.

THE COURT: It appears that he was sentenced for both on

the same day, though.

MS. PEREZ: That is correct, Judge. He was sentenced for

both on the same day.

THE COURT: Refresh my recollection, Mr. McLaughlin. What

is the case law?

And, Miss Brantley, what are the guidelines if they are

close in time and they are sentenced in the same sentencing.

MS. PEREZ: 401.2(2), I believe, Judge.

MR. MC LAUGHLIN: They all count, Your Honor. It is

different conduct that occurs at different times. It is fairly

straightforward.

MS. PEREZ: Again, Judge --

MR. MC LAUGHLIN: Especially in terms of -- I mean, in

terms of the career offender guideline, he has three crimes of

violence convictions. Although he may have been sentenced all at

once, they are three different convictions for three different acts

of criminal conduct.

THE COURT: Miss Brantley, what is the guideline section?

PROBATION OFFICER: Paragraph 35, Your Honor, on page 13 of

the report, the defendant only received one criminal history point

1  for this incident.  The only reason he received the one point and it

2  is counted is because of the nature of the offense.  The violent

3  nature of the offense is why he only received one point for it.  He

4  didn't receive three points as in the other cases.  It was charged.

5  He did receive this arrest while he was in custody, and it was

6  sentenced on the same day.  But because of the nature of the offense

7  is why he only received one criminal history point for the offense.

8          If you look at --

9          THE COURT:  But do we count it separately for the career

10 offender?

11         PROBATION OFFICER:  It's counted separately for the career

12 offender because it's pointed.  Anything that is pointed is counted

13 for career offender.  But, Your Honor, he still has two prior

14 arrests.  The career offender guideline only requires that he has --

15 It is two prongs, and this is the third one.  So the first two are

16 counted and then there is a third arrest.

17         Now, if Your Honor doesn't want to give him the criminal

18 history point for paragraph 35, Your Honor can make that ruling.

19 But he would still count as a career offender because he has two

20 prior violent felony convictions.

21         THE COURT:  So it doesn't really make any difference is

22 what you are saying.

23         PROBATION OFFICER:  No.

24         THE COURT:  Because it bumps him up to a level 37 in a

25 Criminal History Category of a VI.

1          PROBATION OFFICER:  Yes.

2          MS. PEREZ:  And I understand Probation's position, Judge.

3 But again --

4          THE COURT:  That's the way the guidelines work.

5          MS. PEREZ:  I know, Judge.

6          Judge, Mr. Gonzalez was in the custody of the Department of

7 Children's Services at this time.  That was reflected in the initial

8 report --

9          THE COURT:  Please bring the microphone closer to you.

10 Obviously the Interpreters and my Court Reporter are having trouble

11 hearing you.

12          MS. PEREZ:  I apologize.

13          THE COURT:  Why don't you sit down and bring the microphone

14 close to you so you are speaking into the microphone.  It doesn't

15 pick it up unless you are speaking directly to the microphone.

16          MS. PEREZ:  I understand.  I'm short.  So when I stand up

17 it doesn't pick up.

18          Judge, when he was first interviewed by Probation for the

19 purposes of the bond hearing it indicated that in this first offense

20 in '97 he was in D.H.S. custody.

21          Correct, Mr. Gonzalez, you were in D.H.S. custody?

22          MR. GONZALEZ:  Yes.

23          MS. PEREZ:  He was in the Department of Children Services,

24 Judge, because when Mr. Gonzalez came here from Cuba he came here by

25 himself.  He was later --

1          THE COURT:  Came here illegally?

2          MS. PEREZ:  No.  He came here alone.  By himself.

3          THE COURT:  But how did he get here?  Did he come on a

4 raft?

5          MS. PEREZ:  On a raft, Judge.

6          THE COURT:  So he came illegally.

7          MS. PEREZ:  That's correct, Judge.  He came here with his

8 uncle, without his parents, but initially he was not in his uncle's

9 custody.

10          Judge, it's the circumstances of the offense.  I mean, he

11 was by himself.  He was without his parents.

12          THE COURT:  Perhaps he should not have come here to begin

13 with.

14          MS. PEREZ:  Judge, would he rather stay in a communist

15 country?

16          THE COURT:  Well, perhaps he wouldn't be engaging in

17 criminal activity here and in jail.

18          MS. PEREZ:  Judge, I don't recommend that anyone stay in a

19 communist country.

20          THE COURT:  So they come here and engage in criminal

21 activity here, it is better?  I would prefer if they are going to

22 continue to engage in criminal activity that they stay in their home

23 country.

24          MS. PEREZ:  It is not better, Judge.  But I don't think

25 that it was better for him in his home country.  His father

committed suicide --

         THE COURT:  But, I mean, he comes here and is going to
pollute this community with his criminal conduct, that is okay?  Is
that what you are saying?

         MS. PEREZ:  No, that is not what I'm saying.  I'm asking
the Court to consider his background, where he came from, the
examples that he had, that he was by himself, that his father
committed suicide, his mother abandoned him.  That's why he left
Cuba.

         THE COURT:  But there are other people here that have had
parents commit suicide, who have parents that abandoned them, that
don't engage in criminal conduct.

         MS. PEREZ:  I understand that, Judge.  But not all of us
have the benefit of having good parents that have good moral fiber
that are good examples.  It's hard when you are lost and you have to
find your way by yourself and you have had a couple of times to
learn.

         And Mr. Gonzalez has really tried, Judge.  Even at the bond
hearing the Magistrate noted that he has employment history, he has
worked, he has worked in Panama City, he did try to break away from
this.  Unfortunately his wife who is not here today because she is
very sick with cancer, Lisa took him up to Panama City to get him
away from Miami, to get him away from his friends, to get him away
from bad influences.  Because Mr. Jesus Avila is a very bad
influence.  He is.  I don't have any problem saying that.

1      THE COURT:  Miss Perez, you have to think not just about

2  yourself, Miss Perez, and your passion, but remember we are working

3  with interpreters and you have the responsibility as a speaker to

4  help your client by slowing down so that the translators can do

5  their job to make sure your client understands what's going on.

6      MS. PEREZ:  I understand, Judge.  I apologize.

7      So yes, Judge, I think that Mr. Avila and Mr. Gonzalez are

8  not the same kind of person.  I think Mr. Gonzalez really tried to

9  break away from this.  He really did.  He is immature.  He is

10  immature because he was deprived of a normal childhood.  He did not

11  have a normal childhood by any means, Judge.

12      And it's that immaturity that brought him into this

13  problem; not a desire to do bad, Judge.  Mr. Gonzalez really was on

14  the right track.  He was working hard on his music career, he was

15  recording, he was doing what he had to do, and he just got sucked

16  in.  He really got sucked in.  That's why I asked the Court to look

17  at the different conduct.

18      He was not sitting around thinking of what bad thing he

19  could do.  He was not sitting around thinking of what friends he

20  could call to broker a robbery.  That's not what he was doing,

21  Judge.  Neither was Mr. Cantillo.

22      THE COURT:  Okay.

23      MS. PEREZ:  And, Judge, that's one of the reasons why I ask

24  the Court to come down because of his criminal history because I

25  think it is unfair I think that if he would have had parents and if

1   he would have been able to have a lawyer he would not have these

2   convictions, Judge.  He was represented by a Public Defender.  He

3   has indicated that he saw the Public Defender one time.

4           THE COURT:  Oh, Miss Perez, don't disparage another

5   professional.

6           MS. PEREZ:  I'm not.

7           THE COURT:  You say, "Oh, he had a Public Defender.

8   Therefore he didn't have a lawyer."  That kind of comment is

9   counterproductive with me.

10          MS. PEREZ:  Judge, Mr. Gonzalez told me he saw his lawyer

11  one time.  That's what I'm relaying to Your Honor.

12          THE COURT:  This kind of argument is not helpful to your

13  argument.

14          MS. PEREZ:  Judge, I apologize.  I'm only relaying the

15  facts Mr. Gonzalez told me.  I don't have a reason to disbelieve

16  him.

17          THE COURT:  But as long as you are going to keep repeating

18  them, I'm telling you that they are not successful arguments, Miss

19  Perez.

20          MS. PEREZ:  Judge, this is the only argument that I have

21  with respect to the downward departure on the criminal history was

22  his age, the circumstances, his background, the living circumstances

23  that he found himself in, and it is because of that that I ask Your

24  Honor not to apply the career offender.

25          THE COURT:  What is the government's response?

The government needs to also understand that I am concerned about an issue here.  Ultimately I have to be responsible to fashion a sentence that takes into consideration each defendant's background, but also their positions within this offense.  And I'm just concerned, since I am sentencing the crew first before I sentence Mr. Grajales that -- and I know that Mr. Grajales has no prior criminal history.  I'm concerned that I am going to end up sentencing the smaller players greater than the principal player and that among the crew members Mr. Barrera-Avila is obviously more responsible.

These were not minor players.  They were all adults.  But I'm just concerned, Mr. McLaughlin, that once I impose the sentence I don't have any way to make sure that I sentence everyone appropriately.

MR. MC LAUGHLIN:  I will say this, Your Honor.  Mr. Puebla received 195 months yesterday.  As the government looks at the guidelines and the statutory mandatory minimum sentences in this case, Mr. Cantillo-Martinez will receive 180 months.  Mr. Barrera did receive 322.  It is our position that Mr. Gonzalez receive the same.

I would say this in response to defense counsel's arguments and assertions:  The notion that Mr. Gonzalez is somehow a minor player, has somehow been peer pressured and sucked into criminal activity throughout his life or in this case is in the government's view absurd.  Mr. Gonzalez was intimately involved in this.  He got

```
 1  involved right after Mr. Barrera-Avila went to that second meeting.
 2  Mr. Gonzalez was a part of working with Mr. Orestes-Garcia, whose
 3  nickname is Timba, who we heard about at trial.  In fact,
 4  Mr. Gonzalez gave Mr. Garcia his card to look for weapons.
 5          If you look at the toll records for Mr. Gonzalez's phone
 6  and Mr. Garcia's phone, those two were communicating right up until
 7  they are arrested in this case.  And, in fact, as the trial
 8  demonstrated it was Mr. Gonzalez who tipped off Mr. Garcia to drive
 9  away because they were getting arrested.
10          I don't know if defense counsel didn't read the trial
11  transcripts, didn't talk to her clients, but I don't think she is
12  quite aware of the extent of her client's -- and I refer to
13  Mr. Gonzalez -- his involvement in this case, Your Honor.  No
14  downward departure is warranted.
15          THE COURT:  Okay.
16          MS. PEREZ:  Judge, I have spoken to my clients.  I have
17  spoken to Mr. Cantillo, I have spoken to Mr. Gonzalez, and I have
18  attended the debriefing of my clients.  And, Judge, once again I
19  don't know where the government is getting that my client gave
20  Timba, Mr. Garcia, a vehicle to go get a gun.  That is not correct.
21  That is not correct.
22          THE COURT:  Is your client going to testify to that?
23          (Off-the-record discussion between Miss Perez and
24  Mr. Gonzalez.)
25          MS. PEREZ:  Judge, he is representing to me that
```

1  Mr. Garcia requested that he -- let him borrow the car, but it was

2  not for the gun.  If Your Honor wants to hear from him directly --

3          THE COURT:  I don't want --

4          I'm afraid, Miss Perez, that you are very emotionally

5  attached to your argument, and your passion may be clouding your

6  need to protect your client and to protect him from getting into a

7  situation where he can later be shown to be not totally candid or

8  truthful which would affect his ability to benefit from --

9          MS. PEREZ:  From his cooperation, Judge.

10          THE COURT:  Yes.  So you need to always keep your client's

11  best interest in mind.

12          MS. PEREZ:  Judge, I'm keeping my client's best interest in

13  mind.  That's why I am not placing him on the stand, Judge, because

14  he has cooperated with the government and I would like for him to

15  get the benefit of his cooperation.  He was on the government's

16  witness list.  He was not called.  Mr. Cantillo was called instead,

17  Judge.

18          Judge, it bothers me when I feel that there is a

19  misstatement and it is my client's word against another one, that

20  who is not here, because Mr. Garcia hasn't even been arrested, which

21  bothers me because he has not even been debriefed, which bothers me

22  even more because the government is relying --

23          THE COURT:  Wait a minute.  Tell me precisely what you are

24  saying, Mr. McLaughlin, and what is the source of your information

25  so that Mr. --

1    MR. MC LAUGHLIN:  It was laid out in a very crystal-clear

2 fashion, Your Honor, for the Court and for the jury during

3 Mr. Grajales's trial.  Mr. Barrera-Avila testified to that,

4 Mr. Puebla would testify to that, Mr. Cantillo discussed

5 Mr. Garcia's involvement.  It's fairly clear from the government's

6 point of view.

7    THE COURT:  Okay.

8    MS. PEREZ:  I don't want to argue with the government,

9 Judge.  I would just caution the government not to always believe

10 everything you hear from Mr. Barrera-Avila who has a history for

11 being not very candid.

12    MR. MC LAUGHLIN:  And I would just say this, Your Honor.

13 The government sat here and listened to defense counsel essentially

14 blame Mr. Barrera-Avila for her clients' troubles and if not all the

15 troubles of the world.  We stand by the case we presented to the

16 Court, to the jury in Mr. Grajales's trial, and we have nothing

17 further to say on that matter.

18    THE COURT:  Based upon the facts here I do not believe that

19 there are sufficient facts to support a downward departure on the

20 grounds that the criminal history overstates his criminal history.

21 All he needs are two prior violent felonies to get the career

22 offender treatment.  He not only has two, but he also has the third.

23 The nature of his prior offenses are the same as what was involved

24 in this particular case.

25    I'm sorry that Mr. Gonzalez chose to continue for whatever

1 reason.  He is an adult.  Nobody held a gun to his head.  If he is

2 immature and the age has not helped his maturity, then I need to

3 protect the community because it doesn't sound like he is going to

4 become anymore mature and we need to make sure that he doesn't

5 continue in this kind of conduct because he is so easily led because

6 of his immaturity.

7           Any other objections?

8           MS. PEREZ:  No, Your Honor.  Those are the only objections.

9           The only argument remaining is my argument on behalf of Mr.

10 Cantillo and Mr. Gonzalez under 3553 and the factors to consider.

11           THE COURT:  Based upon the Court's ruling, as to

12 Mr. Cantillo-Martinez, the total offense level is a level 31 and a

13 Criminal History Category of I.  Do the parties agree with that

14 based upon the Court's rulings?

15           MS. PEREZ:  Yes, Judge, we do.

16           MR. MC LAUGHLIN:  Yes, Your Honor.

17           THE COURT:  And as to Mr. Gonzalez, the total offense level

18 is a level 34.  And this of course reflects the acceptance of

19 responsibility by both gentlemen.  And Mr. Gonzalez also has a

20 Criminal History Category of a VI because he is classified as a

21 career offender.  And that provides a guideline range for

22 Mr. Gonzalez of 262 to 327 months.  I would be inclined to sentence

23 at the low end of the guidelines, which would be 262 months, and the

24 60 months would be tacked onto that, which would provide a total

25 sentence of 322.

As to Mr. Cantillo-Martinez, I would also, because he is a Criminal History Category of I, and for all of the reasons why Miss Perez has articulated, if I apply the 3553 factors I would sentence him at the bottom of the guidelines at 120 months. But we also have the 60 months that must run consecutive because of Count 5. And so it would be a total of 180 months. That is where I am before you make your argument and before the parties make their statements.

Since they know sort of where I'm going, it's at the bottom of the guidelines and that I'm simply applying the mandatory consecutive, if they realize that's the best that they can get because it is the best they can get, and they don't want to waste their time -- they feel like it would be a waste of time talking, I respect that. But I am also here to listen to anything that either one of them would like to say.

Mr. Gonzalez, if you would like to say anything, you may do so.

And the same thing, Mr. Cantillo-Martinez.

MS. PEREZ: Thank you, Your Honor. At this time I will proceed briefly.

Judge, Mr. Gonzalez is a 31-year-old man who came to the United States without his parents at the young age of 16 years old in approximately 1994. When Mr. Gonzalez came to the United States, he only had his uncle to care for him, and his uncle traveled with him from Cuba, Judge, when Mr. Gonzalez was 16 years old. The reason Mr. Gonzalez left, Your Honor, was because as previously

1 indicated, his father committed suicide when he was a young child

2 and his mother abandoned him and he had no one to care for him

3 essentially.  When his uncle decided to come to the United States,

4 Mr. Gonzalez came with him.  Otherwise he would have remained in

5 Cuba by himself.

6          Now, Judge, Mr. Gonzalez has a 12th-grade education.  At

7 the age of 17 he dropped out of school because of peer pressure,

8 Judge, and because of immaturity, as stated in the PSI and as

9 indicated by Mr. Gonzalez during the course of our interview with

10 Probation.

11          Now, Judge, years after arriving in the United States in

12 approximately 1996, is when Mr. Gonzalez had his first run-in with

13 the law regarding a cloned phone for which he was not given any

14 criminal history points.

15          Judge, just shortly thereafter, in '97, is when you see the

16 other crimes that we referred and which bring him into a Criminal

17 History Category that he is in.

18          And, Judge, it is because of those facts that I ask the

19 Court to come down on a downward departure.

20          THE COURT:  How can I go down below a mandatory minimum?

21          MS. PEREZ:  Judge, first and foremost I think that the main

22 reason why the Court should come down is because he should not be

23 sentenced to the same sentence as Mr. Avila because

24 Mr. Avila had a greater degree of participation, even though Your

25 Honor has already ruled that my clients are not minor participants.

1  Mr. Gonzalez's degree of participation is not that of Mr. Avila and

2  I don't think it is fair to have the same sentence.

3          THE COURT:  Okay.

4          MS. PEREZ:  I think that that would be telling everyone,

5  "Well, even if you don't do as much you are going to get sentenced

6  as you did."  And that's not fair.

7          And Mr. Avila -- again, Judge, I don't know what his

8  criminal history was, but based on --

9          THE COURT:  So what are you telling me that his sentence

10 should be?

11         MS. PEREZ:  I think his sentence should be less than

12 Mr. Avila.

13         THE COURT:  What?

14         MS. PEREZ:  Judge, I think that that he should not be

15 sentenced to more than 12 years.  12 years is a lot of time.  It's a

16 lot of time.

17         THE COURT:  Okay.

18         MS. PEREZ:  Judge, he was 17 years old.  At 17 years old --

19         THE COURT:  But that is a number of years ago.  He is now

20 31.

21         MS. PEREZ:  I understand, Judge, that he is 31.  But he is

22 a 31-year-old with the mentality of a 16-year-old, Judge, because he

23 has not matured --

24         THE COURT:  What kind of psychological report do you have

25 to support that statement?

1      MS. PEREZ:  Judge, I don't have a psychological report.  I

2 just -- I have spent time with Mr. Gonzalez.  Mr. Gonzalez is a kid

3 at heart.  He is very immature.  That's his wife's biggest complaint

4 about him.  That's why she didn't want him in Miami.  That's why she

5 took him out of Panama City.

6      Judge, it's the truth.

7      THE COURT:  So why should the rest of society though

8 tolerate having Mr. Gonzalez out in society if this is not the first

9 time, it's not the second time, it's not the third time, it's the

10 fourth time he has been engaging in this type of conduct?

11      MS. PEREZ:  Judge, I think 12 years in prison is a long

12 time considering the fact that Mr. Gonzalez has already spent seven

13 years in prison.  He didn't have a childhood.  He spent his

14 childhood in jail, Judge.  I mean, give him a chance.  I saw what he

15 can do.

16      Judge, Mr. Gonzalez was on the right track.  He had even

17 stopped with the drug trafficking.  He was exclusively working on

18 his music career.  He was pulling away from everybody.  You are

19 going to hear from his manager.  He really tried to go the right

20 way.

21      THE COURT:  We are not hearing from anyone.

22      MS. PEREZ:  Okay, Judge.  I understand.

23      THE COURT:  You have a half an hour for each case.

24      MS. PEREZ:  I understand.

25      THE COURT:  It is now 10 of 10.  Granted we got started

1  only an hour ago, but we are now over your time.

2      MS. PEREZ:  That's fine, Judge.  But again, Judge, that's

3  what the documents indicate, that is what his work history

4  indicates.  He wasn't sitting around doing nothing.  He was working

5  in construction.  He was working for the City of Panama City.  I

6  have his pay stubs here.

7      THE COURT:  Right.  But what do I do with the fact that I

8  have someone who obviously has a split personality?  He is wonderful

9  to the people who love him, to the people that he works with, and

10 then he has a side life in which he engages in criminal conduct.

11      The rest of the community is entitled to have someone who

12 is the positive person, not the negative person.

13      Obviously he does not have the strength of character to

14 eliminate the negative side of him.  He had 70 months in prison

15 previously.  That is a significant amount of time.  You would have

16 thought that he had learned.  But yet he is continuing to engage in

17 this kind of conduct.

18      MS. PEREZ:  Judge, you know, one of the things that came

19 out in the government's documents is that when Mr. Gonzalez showed

20 up to the scene he asked Mr. Grajales and others if they were law

21 enforcement.  The reason he did that, Judge, and I'm going to share

22 this with Your Honor.  Maybe Your Honor can understand a little bit

23 more of what happened.  When Mr. Avila first came to Mr. Gonzalez,

24 Mr. Gonzalez told Mr. Avila he was nuts and that nobody in this town

25 had 30 kilos and that these were police officers and that he should

1 stay away from this.

2          Mr. Avila then consulted with what he considers his

3 religious Godfather.  His religious Godfather also told him that

4 this was not the correct thing to do.

5          When Mr. Gonzalez showed up, Mr. Gonzalez was trying to

6 make a point to Mr. Avila.

7          THE COURT:  Why did Mr. Gonzalez show up?

8          MS. PEREZ:  Judge, he didn't want to leave Jesus by

9 himself, for whatever reason, and I can't understand it.  Maybe

10 Mr. Gonzalez will enlighten Your Honor a little bit more when he

11 speaks to the Court briefly before sentencing.  But --

12          THE COURT:  Why don't we have him speak to me, because we

13 have seven minutes left.

14          MS. PEREZ:  Judge, I'm going to let him address the Court

15 then.

16          THE COURT:  You can have a seat, Mr. Gonzalez, because I

17 need to have you close to the microphone so that the Interpreter can

18 hear you accurately.

19          MR. GONZALEZ:  Tell the Judge, Your Honor, that first and

20 foremost I am apologizing to the U.S. government, I am apologizing

21 to you as well because I'm sitting here, and I love my relatives as

22 well as my friends that are seated in the back.

23          THE COURT:  Do you want to tell me who all is here so I can

24 acknowledge them?

25          MR. GONZALEZ:  My grandmother, my uncle, my other aunt, my

niece, the friends, the music friends, the producer, the people that were with us when we were making the music.

What I want to tell Your Honor is that I accept responsibility for making the wrong decision. I'm going to tell you also that yes, I did. I did do drug trafficking but I never had Jesusito trafficking in drugs. I did tell the United States government that that was true, that I did that, and I said so from the beginning.

And I want you to also know Jesusito and Jesus and Puebla have always been together committing robberies.

What I want you also to know is that I am a man who had a dream and I did traffic in drugs to get some money, but I was never, I never had the intention of getting involved in robberies.

When I came from Panama City down here it was to finish the music. I stayed here so that I could finish with the music.

I did know about the robbery. I did tell Jesusito that it was impossible for someone to have 30 keys because I have seen 30 keys and it wasn't possible. I told him it was impossible. I did go to his house, I did talk to him, I did try to prevent him from committing the robbery.

I did get in the car before meeting at 36th with the police officer, with the agent, with the detective, with the one that was supposed to be the confidential informant, I asked him to drop me home, and he told me that this would have to be afterwards because this was going to take place at the airport.

1      I want to accept responsibility.

2      As she stated, it is true that I am 31 years of age and

3 that I do have a good heart.  And having a good heart is what has

4 brought this new disgrace upon me and to spend the rest of my life

5 behind prison.

6      It's true that I'm very hurt and it is true that I did have

7 a dream, and that I did leave behind the drug trafficking business

8 to get to my goal, which was music.  But the truth is that I am so

9 repentant for having gotten into that car that day.

10      The truth is that I would like to ask you to have pity on

11 me, and I would also like to ask the U.S. government, especially the

12 U. S. Attorney, to have time to talk, to have some conversation.  I

13 want him to know -- to learn to know me better and to know the type

14 of person I am.

15      It is true I did traffic.  And in reality I would rather

16 him not ask someone else about me.  Whatever he needs to know about

17 me I would prefer for him to ask me directly.  I would tell the

18 truth because I am here to tell the truth.

19      I am also very repentant that Ramon, who I met at a studio,

20 met these people through me and I never had problems and today he is

21 sitting in a courtroom like this one facing a good amount of time.

22      I tell you the truth is that I am very remorseful and

23 everyday that I spend in that cell up there I cry.  And I have to be

24 here because of my friends.

25      And it is the truth that my wife didn't want me to come

 1  here because she knew that my friends would get me in trouble.  That

 2  I cannot change.  But the only thing I can do is ask the Judge and

 3  the U. S. Attorney, the U.S. government, to have mercy on me.  I

 4  cannot spend the rest of my life behind bars.

 5          It is true that I did commit crimes when I was much

 6  younger.  But they weren't these kind of crimes.  It is true that

 7  the crime makes it look greater.  But it was nothing out of this

 8  world.

 9          THE COURT:  What was not out of this world?

10          MR. GONZALEZ:  You know, I'm being accused of a carjacking,

11  and the carjacking was not really a carjacking because the man

12  wanted us to sell the car so that he could get the insurance money,

13  and I stayed driving the car.

14          THE COURT:  You were going to help somebody defraud the

15  insurance company; is that what you're saying?

16          MR. GONZALEZ:  You see, at that time I had just arrived

17  from Cuba.  I know nothing.  It is as though I was walking

18  blindfolded.

19          I'm very sorry and very repentful (sic) for everything I

20  have done throughout my life.

21          I do apologize to my family.  My wife needs me a great

22  deal.  She is always sick and she is suffering.  She has cancer, she

23  has kidney failure --

24          THE COURT:  I wish --

25          MR. GONZALEZ:  I have been at the hospital with her for the

two years -- for two years.  Every year that goes by the situation

gets worse right now at the house.  She is working right now, but

she is making a great effort because the parents are helping her

out.

I would like to show you I am talking to you from the heart

the truth because I am not concealing anything from you.  For me,

you know, I don't want -- I don't have anything else to hide.  Why

hide anything?  I have nothing else to hide.

The only thing I am asking you please is to have mercy on

me.

The truth is that Jesus, yes, you know, he is trying to

seem or they make him seem to appear innocent.

THE COURT:  Oh, no, Mr. Gonzalez.  Mr. Barrera-Avila is

definitely not innocent.  And I see him as being very knowing and

very greedy and very involved.  Unfortunately you did not listen to

your wife, you listened to your friend.  And I really wish for your

wife's sake that we could turn the clock back.

I talked this morning before I came out here.  I spent time

with the Probation Officer who has interviewed all of your family

members and who has shared with me their shock and utter amazement

that you got yourself involved in this because they know your good

side, they know what you have done, how faithful you have been to

your wife, how you have been there.  And I am as surprised and

disappointed as they are that you made the choice that you did

because it has such dramatic consequences.

1      But you are 31 years old.  You had been in prison for 70

2  months.  You knew what illegal activity resulted in.  Your wife told

3  you don't go back there, your Godfather tells you don't get

4  involved, you yourself know that this is not a good thing.  And yet

5  you do it.

6      MR. GONZALEZ:  Your Honor, may I tell you something?

7      THE COURT:  Yes.

8      MR. GONZALEZ:  I would like to -- the truth is that you

9  don't have to believe me but I would like to tell you something that

10  for me -- the truth is that for me -- that goes to the U. S.

11  Attorney as well -- I did tell Jesus Barrera to drop me off home.

12      THE COURT:  Why didn't you just get out of the car and

13  leave?  You didn't do it and now you are looking backwards and

14  thinking, "Oh, I'm not -- I would like to turn the clock back.  I

15  would like to do things differently."  But, unfortunately, what is

16  done is done.

17      MR. GONZALEZ:  That is true.  That I cannot change.

18      I was making -- working and doing what I was doing because

19  I am a businessman.  I am not a trafficker.  Almost $15,000 every

20  two weeks.

21      THE COURT:  You were trafficking and earning $15,000 every

22  two weeks when you were trafficking?

23      MR. GONZALEZ:  What I'm telling you is that I tried to stop

24  him and to tell him not to do this, and he said, "We are going to

25  the airport."  How could I be that stupid that I would go ahead with

1  a robbery when I was making almost $15,000 biweekly.

2          THE COURT:  But you did.  I wish you hadn't.

3          MR. GONZALEZ:  I really want to cooperate with the United

4  States government because I want to go back home.

5          MR. MC LAUGHLIN:  May I note this?  The longer this goes on

6  the less likely that is going to become.

7          THE COURT:  And I was concerned about that.  So perhaps we

8  shouldn't say anything more.

9          And Mr. Cantillo-Martinez, is there anything that you would

10 like to say before I formally impose sentence?

11         MR. CANTILLO-MARTINEZ:  Yes.

12         THE COURT:  Sir.

13         MR. CANTILLO-MARTINEZ:  First and foremost, good morning,

14 Your Honor.

15         I want to add two things before saying what I have to say.

16 I didn't come from Panama City here to commit a robbery because I

17 was living here.  At no time did I ever meet with Jesus to determine

18 how much cocaine everyone was going to get.  Just for driving the

19 car I don't believe they would have given me half of everything.

20         THE COURT:  No.  They were going to give you five kilos.

21         MR. CANTILLO-MARTINEZ:  Okay.  That I told the U. S.

22 Attorney as well, the Prosecutor.  But at no time did we ever meet

23 to determine what amount of cocaine each one of us was going to get.

24         THE COURT:  Then why did you tell the U. S. Attorney that

25 you were going to get five kilograms?

1          MR. MC LAUGHLIN:  That was what everyone expected they

2  probably were going to get based on the amount of cocaine.

3          And I would note, Your Honor, for Mr. Cantillo's sake that

4  the quicker this goes the better.

5          And I would bring the Court's attention that in listening

6  to both of these, these are also two people who directed

7  Mr. Barrera-Avila to write the letter to I believe either the Court

8  or counsel as to how neither of them were involved so they could get

9  out and make money and provide for Mr. Barrera-Avila.

10          These are individuals with -- they are no stranger to how

11  things work, Your Honor.  So it's very difficult for the government

12  to sit here and listen to it over and over again, especially for

13  their benefit.

14          THE COURT:  Okay.

15          Anything else, Mr. --

16          MR. CANTILLO-MARTINEZ:  Yes.  At no time did I ever tell

17  the U. S. Attorney, the Prosecutor, that I was going to receive five

18  kilos.

19          THE COURT:  You did, you and Mr. --

20          COURT INTERPRETER:  Could we provide the interpretation

21  please, Judge, before you --

22          THE COURT:  Yes.  I'm sorry.

23          MR. CANTILLO-MARTINEZ:  First and foremost I know that we

24  are running out of time but I would like to take this opportunity,

25  Your Honor, to ask God for forgiveness, ask you for forgiveness, ask

1  the Prosecutor for forgiveness, to my colleagues, the music

2  colleagues, my wife, and the pastor.

3          I want you, Your Honor, to take into consideration that

4  this is my very first time.  I accept that I committed a grave

5  mistake, but I am a human being and all human beings make mistakes.

6          And the truth, I am not that type of person.  I'm only an

7  individual who came from Cuba to this country for running after a

8  dream.

9          I am asking you, Your Honor, to be lenient with me and to

10  give me the opportunity to get out in time so that I can continue

11  with my dream.  I know that I should have thought about it better.

12  I know I cannot turn the clock back and to go back to the moment of

13  the time that I decided to participate in this crime and not to do

14  so.  But I can ask again forgiveness before God and from all the

15  people who are present in this court today, and to say that I am

16  truly remorseful.  Thank you.

17          THE COURT:  Okay.  Thank you very much

18  Mr. Cantillo-Martinez.

19          Mr. Cantillo-Martinez and Mr. Gonzalez, to the extent that

20  the Court has the power, the Court accepts your statements of

21  remorse and you are forgiven.  Unfortunately, there are consequences

22  to the choices we make.

23          I hope that both of you understand that all of the actions

24  that we take have consequences and impacts on other human beings.

25  The most immediate consequences of course are to your family and

1 your friends because they are the ones who will not have you in

2 their presence, and particularly I'm sorry for Mr. Gonzalez that he

3 did not listen to his wife and his Godfather and everyone else.

4          In pursuing a dream, Mr. Gonzalez and

5 Mr. Cantillo-Martinez, it is very important to recognize that you

6 cannot just be focused on yourself and do whatever you feel is

7 necessary to achieve your own personal dream.  You've come to this

8 country to do that because you thought you had opportunities here.

9          It is very important that each one of you build up this

10 community, not tear it down.  It is very important that both of you

11 do actions that are positive, not tear it down.

12          The thought that you, Mr. Gonzalez, thought it was okay to

13 get the capital that you needed for your business venture, your

14 music career, by drug trafficking, is very disconcerting to say the

15 least.  If you want to be a success in this country there are legal

16 ways to do it.  If you have come to this country because you think

17 it provides opportunity and you have made a choice, the rest of the

18 community here would hope that you build it up, not take it down.

19          So it is very important as you go forward to remember you

20 have an obligation to the community in which not only you but your

21 family members live.  If you want them to be safe and to be

22 successful and to live in a positive place, then you need to be a

23 leader and a role model in how you conduct your business activities,

24 the choices that you make, the people that you associate with.

25          MR. GONZALEZ:  May I ask you a question?  May I tell you

1 something?

2       THE COURT:  If it is very short.  Very short, Mr. Gonzalez.

3 One minute.

4       MR. GONZALEZ:  I had left the drug deal behind when I

5 started with my music career.  I had left all that behind.  Drugs

6 have nothing to do with music.

7       THE COURT:  I hope not.

8       MR. GONZALEZ:  That's one of the things that was really

9 getting me out of the previous life I had lived.

10       THE COURT:  Okay.  Unfortunately, you hadn't separated

11 yourself completely.

12       But it doesn't stop you from continuing to sing and

13 compose.  You can continue to do that and hopefully lift up people's

14 spirits.

15       Anything else?

16       Hearing nothing else, the Court has considered the

17 statements of all of the parties and the Presentence Report which

18 contains the advisory guidelines and the statutory factors.

19       It is the finding of the Court that neither defendant is

20 able to pay a fine and, therefore, I shall not impose a fine on

21 either defendant.

22       In applying the 3553 factors, for all of the reasons we

23 discussed here today the Court believes that a sentence at the

24 bottom of the guidelines is the appropriate sentence.  It is no

25 greater than necessary, it avoids the disparity in sentencing

1  similarly situated individuals, and it takes into consideration the

2  fact for Mr. Cantillo-Martinez this is his first conviction, it does

3  recognize that as far as Mr. Gonzalez is concerned this is his

4  fourth conviction.  Therefore, the Court will sentence as the Court

5  has previously announced that it would.

6          It is the Judgment of the Court that the defendant Ramon

7  Cantillo-Martinez is committed to the Bureau of Prisons to be

8  imprisoned for a total of 180 months.  This term consists of 120

9  months as to Counts 1 through 4 to be served concurrently with each

10 other and consecutively to the 60 months imposed in Count 5.

11         As to Mr. Dawis Fernandez Gonzalez, it is the Judgment of

12 the Court that he is committed to the Bureau of Prisons to be

13 imprisoned for a total of 322 months.  This term consists of 240

14 months as to Counts 1 and 2, 262 months as to Counts 3 and 4, and

15 120 months as to Count 6, to be served concurrently with each other

16 and consecutively to the 60 months imposed as to Count 5.

17         Let me just make sure, Miss Brantley, that that is a

18 correct allocation for everyone.

19         PROBATION OFFICER:  Yes, Your Honor.

20         THE COURT:  Is it correct to say, though, that the 120

21 months is consecutive to the 60 months?

22         PROBATION OFFICER:  Excuse me, Your Honor?

23         THE COURT:  The total term of 322 months is broken down as

24 follows:  240 months as to Counts 1 and 2 --

25         PROBATION OFFICER:  Yes, Your Honor.

1          THE COURT:  -- the low end of the guidelines of 262 months
2  as to Counts 3 and 4, the 120 months as to Count 6, all of those are
3  to be served concurrently, and they all come into 262 months, and
4  then the 60 months for Count 5 is consecutive to the total of the
5  262 months.

6          PROBATION OFFICER:  Yes, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          Upon release from imprisonment both defendants will be
9  placed on supervised release for a term of five years.  This term
10 consists of, in Mr. Cantillo Martinez's case, three years as to
11 Counts 1 and 2 and five years as to Counts 3 through 5, all such
12 terms to run concurrently.

13         As to Mr. Gonzalez, the term consists of three years as to
14 Counts 1, 2 and 6, five years as to Counts 3, 4 and 5, all such
15 terms to run concurrently.

16         Within 72 hours of release from the custody of the Bureau
17 of Prisons, each defendant shall report in person to the Probation
18 Office in the district in which he is released.

19         While on supervised release he shall not commit any crimes,
20 he is prohibited from possessing a firearm or other dangerous
21 device, he shall not possess a controlled substance, he shall
22 cooperate in the collection of DNA, and shall comply with the
23 standard conditions of supervised release, including the following
24 special conditions as set forth in Part G of the Presentence
25 Investigation Report, which for both includes cooperating with

1 Immigration during removal proceedings, the substance abuse

2 treatment, and the self-employment restriction.  The self-employment

3 restriction is you can be self-employed, but it must be with the

4 approval of your Probation Officer.

5          As to Mr. Cantillo-Martinez, he shall immediately pay to

6 the United States a special assessment of $100 each as to Counts 1,

7 2, 3, 4 and 5, for a total of $500.

8          As to Mr. Gonzalez, he shall immediately pay to the United

9 States a special assessment of $100 as to each Counts 1, 2, 3, 4, 5

10 and 6, for a total of $600.

11          The total sentence as to Mr. Cantillo-Martinez is 180

12 months of imprisonment, five years of supervised release, and the

13 $500 special assessment.

14          The total sentence as to Mr. Gonzalez is 322 months of

15 imprisonment, five years of supervised release, and the $600 special

16 assessment.

17          Now that sentence has been imposed, does either defendant

18 or his counsel object to the Court's findings of fact or the manner

19 in which the sentence was pronounced?

20          MS. PEREZ:  Yes, Judge.  I would just preserve all

21 previously lodged objections.

22          THE COURT:  Gentlemen, you both have the right to appeal

23 the sentence that I have just imposed.  Any notice of appeal must be

24 filed within 14 days after the entry of the Judgment.  My Courtroom

25 Deputy will probably prepare the Judgment today.  So the time will

1 start running tomorrow.

2          If you are unable to pay the costs of the appeal, you may

3 apply for leave to appeal in forma pauperis.

4          Any special requests?

5          MR. MC LAUGHLIN:  Your Honor, at this time we would ask

6 that the preliminary order of forfeiture be included in both

7 Judgments.

8          THE COURT:  And that is as to the weapon?

9          MR. MC LAUGHLIN:  Correct.  Docket Entry 110.  And there

10 are no counts to dismiss.  That's all for the government.

11          THE COURT:  The forfeiture did not include the car,

12 correct?

13          MR. MC LAUGHLIN:  Correct.

14          THE COURT:  Okay.

15          MS. PEREZ:  We would ask that the defendants be housed in a

16 Florida facility or in a facility nearest Florida, and we would ask

17 the Judgment reflect that language, Your Honor, so that they would

18 try to place them in jail in Florida --

19          THE COURT:  I will make as part of the Judgment and

20 Conviction for both gentlemen the forfeiture pursuant to the

21 preliminary order of forfeiture, which was the forfeiture of the

22 weapon, and I will put on the Judgment and Conviction that both be

23 housed in a facility as close to South Florida as possible.

24          MS. PEREZ:  And, Your Honor, as to Mr. Gonzalez, can Your

25 Honor also make a recommendation for the drug program?  I think that

1 he qualifies, Your Honor.

2       THE COURT:  For Mr. Gonzalez?

3       MS. PEREZ:  Yes, Judge.

4       THE COURT:  I will be happy to do that.

5       For the record, I did review all of the letters that were

6 filed on behalf of both defendants.  I am sorry for their family

7 members that they made the choices that they did.  But I'm hoping

8 that they have not damaged their cooperation efforts in this hearing

9 and that there will be further action in this case on their behalf

10 by the government.

11      Anything else?

12      MS. PEREZ:  No, Judge.  Thank you very much.

13      THE COURT:  We are in recess.

14      MR. MC LAUGHLIN:  Thank you, Your Honor.

15      (This matter concluded at 10:30 a.m.)

16              **CERTIFICATION**

17

18 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

19 OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20 October 5, 2010          S/DAVID S. EHRLICH
                          Official Court Reporter

21

22

23

24

25